**MODIFY and AFFIRM; and Opinion Filed October 22, 2015.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-14-01127-CR

### RUBEN LORENZO PAZ, Appellant
### V.
### THE STATE OF TEXAS, Appellee

### On Appeal from the 291st Judicial District Court
### Dallas County, Texas
### Trial Court Cause No. F-1353572-U

# MEMORANDUM OPINION

Before Justices Fillmore, Stoddart, and Richter[1]
Opinion by Justice Fillmore

A jury convicted Ruben Lorenzo Paz of continuous sexual abuse of a young child, and the trial court assessed punishment of forty years' imprisonment. In three points of error, Paz contends the evidence is insufficient to establish that sexual abuse occurred, the trial court erred by including a definition of reasonable doubt in the jury charge, and the judgment is void because the trial court lacked jurisdiction over the case. We modify the trial court's judgment to reflect the correct identity of Paz's trial counsel and, as modified, affirm the trial court's judgment.

---

[1] The Hon. Martin Richter, Justice, Assigned.

**Background**

Around March 1, 2013, A.G., who was eighteen years old, decided to leave the home she shared with her father, Paz; her mother, Juliana Gonzalez; her younger sister, W.G.; and her two brothers.[2]  She called her friend, Brenda Castellan, and requested that Castellan pick her up. A.G. packed her belongings and left with Castellan.  According to Castellan, A.G. said she was having problems with her father and he was touching her and W.G.  Castellan took A.G. to a store to meet her uncle, and then the two girls went to Castellan's house.

According to Angel De La Para, A.G.'s uncle, A.G. called him and told him she needed help.  A.G. was crying and said she had left her house.  De La Para met A.G. at the "Mexican store."  A.G. was "shaking and crying" and told De La Para that she left home because her father tried to touch her.  A.G. asked De La Para not to tell anyone because she did not "want the family to be apart."  De La Para told A.G. she needed to tell her mother and her aunt about what was happening and that he "could not keep this inside" because it was very serious.  When De La Para's wife, Elaina Gonzalez, who was A.G. and W.G's aunt, came home, he told her what A.G. had said.

Elaina testified A.G. called her on a Thursday, but she was at school and could not answer the call.  When she came home, De La Para told her about his conversation with A.G. and that A.G. said Paz had been abusing her.  Both De La Para and Elaina testified Elaina fainted when she was told about A.G.'s allegations.  Neither De La Para nor Elaina called the police that evening.  According to De La Para, Elaina called her sister, Juliana, the next morning, and Juliana said to "leave the problem" with her.  De La Para and Elaina then went to a soccer game.

---

[2] There is some evidence A.G. left home on March 1, 2013; however, the series of events described by several witnesses would also suggest A.G. left home on February 28, 2013.

W.G. was also at the soccer game and asked if they knew about A.G. leaving home. De La Para suggested that he take W.G. out to eat the following day.

Beginning at 7:25 p.m. on March 1, Elaina and A.G. exchanged messages through Facebook. Elaina asked A.G. what was wrong and whether she had seen A.G. at approximately 12:40 p.m. that day "on 75." A.G. responded that it was not her. Elaina again asked A.G. what was wrong, and A.G. responded that she loved Elaina very much and asked Elaina to take care of W.G. A.G. stated she had "a deep pain." Elaina responded that she could help, and A.G. stated she could not handle what she was going through anymore and "so I die." Elaina again asked what was wrong and indicated she was concerned about A.G. A.G. asked for a telephone number at which she could call Elaina and said, "I'm fine it's just that I can't handle this pain, I can't handle it anymore." Elaina gave A.G. a telephone number and asked A.G. to call her. A.G. and Elaina made arrangements for Elaina to pick up A.G. at Castellan's house the following day.

According to De La Para, when he had lunch with W.G., she told him that Paz "abused" A.G. in his bedroom and sometimes A.G. came out of the bedroom with bruises. De La Para testified he asked W.G. if she knew what would happen if he and Elaina helped her, and W.G. responded, "yes, my dad would end up in jail, but I don't want him to touch [A.G.] anymore." De La Para took W.G. home. Later that afternoon, Elaina picked up W.G., and Elaina, De La Para, W.G., and one of A.G.'s cousins went to Castellan's house. De La Para, Elaina, and Castellan's mother, Maria Maldonado, all testified A.G. was crying and told them that her father was touching her. A.G. asked them not to call the police. According to De La Para, Elaina, and Maldonado, W.G. began crying and said the same thing was happening to her.

Elaina testified De La Para called Juliana and asked her to come to his and Elaina's house. After Juliana and her two sons arrived, Elaina asked Juliana what they were going to do.

–3–

Juliana requested that Elaina give her some time and then went home with her sons while A.G. and W.G. stayed at De La Para and Elaina's house. Juliana, on the other hand, testified Elaina called her on Sunday, March 3, 2013, between 11:00 a.m. and 12:00 p.m., to tell her the girls had accused Paz of abusing them. She confronted Paz with the allegations and he denied them.

On Sunday, Elaina took A.G. and W.G. to church and then to the apartment of Salvador Rivas, a volunteer bible study director at the church. According to Rivas, A.G. said she had been touched by her father. W.G. then said she had gone through similar things or worse things since she was six years old. Rivas did not ask any questions about what those things were, but told the girls he had to call the police. A.G. fainted while Rivas was on the phone. A.G. was taken to the hospital by ambulance before the police arrived at Rivas's apartment.

A.G. told hospital personnel that she had been "groped" by her father three days before. Dallas Police Department Detective Marilyn Edwards was working an off-duty job at the hospital and interviewed A.G. and W.G. separately. Both A.G. and W.G. were upset and crying. A.G. told Edwards that Paz had touched her breasts as well as the outside of her vagina and the touching had been going on for a year. W.G. told Edwards that Paz had been sexually assaulting her since she was six years old. W.G. said Paz put his penis in her vagina and touched her breasts and the last assault had occurred three weeks prior to the interview. Attempting to determine whether there was any possible forensic evidence of the assault, Edwards asked W.G. if Paz had ever ejaculated inside of her. W.G. responded that he had not. After A.G. was discharged from the hospital, she and W.G. were taken to the Dallas Children's Advocacy Center (DCAC) to be interviewed.

Patricia Guardiola, a forensic interviewer at the DCAC, interviewed both A.G. and W.G. At the time, W.G. was twelve years old and A.G. was eighteen years old. W.G. said Paz penetrated her vagina with his penis and touched her breasts. The assaults occurred at a job site

–4–

and at her home. W.G. said the first assault occurred when she was six years old. She had been released from school early and was at home. W.G. told Guardiola that Paz took her into his bedroom to check her private parts. He looked at her vagina and then penetrated her with his penis. He told her not to tell her mother and said, if she told, he would tell her mother that she did something wrong at school.

W.G. specifically described assaults in a dentist office and in the office of a man she identified as "Mr. Terry." W.G. told Guardiola that Paz last assaulted her at an office building at which he performed cleaning services. Because there were cameras throughout the building, Paz turned off the lights and took her into a small bathroom. Paz had her remove her clothes and he removed his clothes. They lay on the floor and he put his penis into her vagina. W.G. also said Paz sucked and squeezed her breasts, and she still had marks from it. Guardiola asked W.G. what caused the assault to stop, and W.G. demonstrated with her hand an up-and-down motion that Paz did on his penis. W.G. stated that made the "white stuff" come out. Paz then rushed over to the sink area and washed his hand, his things, and his mouth.

W.G. also told Guardiola that Paz was doing similar things to A.G. However, according to W.G., A.G. would not let Paz penetrate her. A.G. told W.G. that after A.G. said, "no," Paz slapped her back. W.G. saw a red mark on A.G.'s back at that time.

A.G. told Guardiola that, beginning when she was sixteen or seventeen years old, Paz "checked" her vagina. This first happened when she was not feeling well one day and stayed home from school. After Paz took Juliana to work, he returned to the apartment and told A.G. he had to "check" her. A.G. believed her father was "checking" her because he loved her and wanted to know if someone had touched her.

A.G. told Guardiola the last incident happened in January 2013. Paz agreed to let her go to a dance if she agreed to sleep with him. She told him that she would. The following day, Paz

reminded her of her promise, and they had a discussion about why she did not want to sleep with him. A.G. told Guardiola about instances in which Paz touched her vagina over and under her clothes. A.G. also described talking to W.G. one night after A.G. had an altercation with Paz. W.G. asked A.G. why she was crying, and A.G. refused to tell her. W.G. said that if A.G. would tell her what was wrong, she would tell A.G. what was wrong with her. W.G. told A.G. that, while Paz may have touched A.G., "with her he did something." When A.G. left home, she left a letter for W.G. saying that they should not tell anyone about the abuse.

Paz was arrested at approximately midnight on Sunday, March 3, 2013. On either Monday or Tuesday, A.G. and W.G. left De La Para and Eliana's house and went home with Juliana. Stephanie Orona, an investigator with Child Protective Services, received a referral as to W.G. on March 4, 2013. On Tuesday, March 5, Orona went to W.G.'s home and left a brochure with a business card asking Juliana to contact her. She also went to W.G.'s school, but was told W.G. was absent. Orona contacted Juliana by phone. Juliana said she was at the consulate and would call Orona later. Juliana did not return Orona's telephone call.

Detective Abel Lopez testified the charges against Paz were assigned to him on Tuesday, March 5, 2013. He spoke to Eliana, who told him she was concerned because the girls were no longer with her and Juliana and A.G. wanted to drop the charges against Paz. Lopez tried "off and on for a week" to contact Juliana, and was finally able to reach her. Juliana told Lopez that she wanted to drop the charges. Lopez stated A.G. was an adult and would have to be the one to drop the charges based on her allegations. Because W.G. was a minor, Juliana needed to fill out an affidavit of non-prosecution for her. Juliana and A.G. agreed to come to the DCAC.

Orona finally spoke to Juliana on March 8, 2013. Juliana said she was at the hair salon. Orona asked Juliana why W.G. was not in school. Juliana responded that W.G. was with her and was sad because Paz was not at home. When Orona again asked why W.G. was not in school,

Juliana directed her to talk to her attorney. Both Orona and Juliana testified that Juliana believed the girls when they told her that Paz was abusing them, but also believed the girls when they recanted the allegations.

Juliana, her two sons, A.G., W.G., and an attorney came to the DCAC. Lopez interviewed A.G. first and discussed the affidavit of non-prosecution. According to Lopez, A.G. "pretty much said" that the "things she had talked about" in the forensic interview had happened, but she did not want her father to be in jail. A.G. also told Lopez that Juliana was aware Paz had been "checking" to determine whether A.G. was sexually active.

Lopez then interviewed Juliana. Orona was present for at least a portion of the interview. Lopez did not believe Juliana was being "completely forthcoming." Juliana did not want Paz to be in jail, and she did not appear to be "overly concerned" about some of the statements made by the girls during their forensic interviews. Juliana denied she knew Paz had been "checking" A.G. to determine whether she was sexually active. When Lopez brought A.G. into the room, she denied that she had said Juliana was aware of what Paz was doing and denied her mother knew what had been taking place. Lopez was concerned because they had had difficulties contacting Juliana, Eliana had told him Juliana was trying to get the girls to recant, and A.G. had made inconsistent statements and "changed her story" when Juliana was present. Lopez believed A.G.'s and W.G.'s allegations were true, but they did not want Paz to be in jail. Orona made the decision to remove W.G. from the home and place her into foster care because it did not appear Juliana was protective of W.G.

W.G.'s foster mother took her to be examined at the Referral and Evaluation of At-Risk Children Clinic at Children's Medical Center on March 14, 2013. W.G.'s foster mother indicated W.G. was recanting the allegations. Sandra Onyinanya performed an examination of W.G. and found no types of abnormalities or injuries of the genital area. Based on her

understanding that the last assault occurred three weeks before the examination, Onyinanya was not surprised the examination was normal and that she found no signs of penetration of the vagina. Onyinanya testified a normal examination did not mean sexual activity had not occurred.

Attempting to obtain evidence to corroborate W.G.'s allegations, Lopez searched a home and an office building owned by Terry Kafka, Juliana's employer. Paz performed cleaning services at the office building. Lopez found no evidence to corroborate W.G.'s allegations at either the house or the office building. During an interview with the prosecutor on December 30, 2013, W.G. made an outcry of sexual abuse by Paz and disclosed another location where an incident happened. Lopez then searched the dental office of Dr. Karen Blum, at which Paz also performed cleaning services. A search of those offices detected bodily fluids on a carpet in a small restroom. Lopez removed the carpet and submitted it for DNA testing at the Southwestern Institute of Forensic Sciences (SWIFS).

Testing at SWIFS revealed the presence of semen at three places on the carpet. Ken Balagot, a forensic biologist at SWIFS, used a differential extraction to separate the epithelial, or skin, cells from the sperm cells in samples taken from the three places on the carpet. He then obtained DNA profiles from the epithelial and the sperm cell fractions from each sample and compared those profiles to DNA profiles obtained from Paz and W.G.

Balagot testified he had a very small amount of DNA from the first sample site and obtained only a partial DNA profile from the epithelial cell fraction. Balagot could not conclusively determine the number of contributors to the epithelial cell fraction due to the low amount of DNA. However, the genetic markers that were detected corresponded to genetic markers in the DNA profiles of both W.G. and Paz. Balagot determined W.G. and Paz were each a possible source of, or contributor to, the DNA profile obtained from the epithelial cell fraction. Balagot determined the partial DNA profile obtained from the sperm cell sample was

–8–

from a single male. He compared the partial DNA profile to Paz's DNA profile and, at the nine Short Tandem Repeat (STR) systems tested, the profile matched Paz's DNA profile. Balagot concluded Paz is a possible source of, or contributor to, the DNA profile obtained from the sperm cell fraction.

As to the second sample, Balagot testified there were at least three contributors to the epithelial cell fraction. The DNA profile of the major contributor of the DNA was a single male and, at the nine tested STR systems, matched the profile of Paz. While Paz is the possible source of the major contributor to the epithelial cell fraction, W.G. was excluded as a minor contributor. Balagot obtained a complete DNA profile from the sperm cell fraction from the second sample. The DNA profile from this fraction was from a single male and matched the DNA profile of Paz. Balagot determined Paz was a possible source of, or contributor to, the DNA profile obtained from the sperm cell fraction.

Balagot testified there were at least three contributors to the epithelial cell fraction of the third sample. Balagot could not resolve the results into major and minor contributors, but at least one of the contributors was a male. Paz was a possible contributor to the epithelial cell fraction, but W.G. was excluded as a possible contributor. As to the sperm cell fraction, the DNA was from a single male and matched Paz's DNA profile. Balagot concluded Paz is a possible source of, or contributor to, the DNA profile obtained from the sperm cell fraction.

Balagot performed a statistical analysis to determine the probability of W.G. being a contributor to the epithelial cell fraction from the first sample and of Paz being a contributor to the sperm cell fraction from the second sample. Balagot concluded the probability of selecting at random an individual who is not related to W.G. who would be included as a possible contributor to the DNA obtained from the epithelial cell fraction of the first sample was one in eight in the Caucasian population group and one in thirteen in the Hispanic population group. He further

concluded the probability of selecting at random an individual who was not related to Paz with the same DNA profile as that obtained from the sperm fraction of the second sample was one in 288 quadrillion in the Caucasian population group and one in 9.23 quadrillion in the Southwest Hispanic population group.

Laura Gahn, an expert called by Paz, testified the DNA profiles obtained from the sperm cell fractions were all consistent with Paz's DNA profile. However, there was a "very, very partial profile" obtained from the epithelial cell fraction of the first sample, and it was impossible to determine whether the DNA profile was from one or more people. The genetic markers found in that profile were consistent with the DNA profiles of both W.G. and Paz. However, out of sixteen tested locations, thirteen gave no reportable results. Because so little information was obtained, Gahn considered the results to be "weak." Gahn concluded the epithelial cell fraction of the first sample from the carpet did not necessarily include DNA from anyone other than Paz. She also testified that, even if the DNA came from W.G., the DNA could have been deposited in the restroom at any time and it was impossible to determine if DNA from two people were deposited at the same time. Finally, the presence of sperm cells in the bathroom did not establish there was sexual activity between two people in the bathroom.

At trial, A.G. testified Paz never touched her, but admitted she told the prosecutor the morning of trial that her allegations were true. She claimed she lied to the prosecutor that morning because she thought the prosecutor, by asking about her baby, was going to bring her daughter into "the middle of this one" and because the prosecutor refused to believe her when she said Paz did not touch her. According to A.G., she began having problems with Paz when she was eighteen years old. She wanted to go out with her friends, but Paz was very strict and would not let her do what she wanted to do. She talked to Elaina about her issues with Paz and

they came up with a plan on how to get Paz "out of the picture." According to A.G., Elaina hated Paz and manipulated A.G. to make the allegations. Elaina then involved W.G. in the plan.

A.G. testified the Facebook messages she exchanged with Elaina on March 1 were to make the allegations seem real. According to A.G., she initially told Rivas that Paz examined her by looking at her to determine if she was a virgin. A.G. responded affirmatively when asked whether she was then told that, unless she changed her story and said that Paz touched her, the police would not get involved.[3] A.G. thought her father would be arrested and deported, but did not know he would be charged with a serious crime. Within days of Paz being arrested, A.G. recanted her allegations that he touched her. A.G. admitted she contacted Castellan shortly before trial and asked Castellan and Maldonado to not appear at trial.

W.G. testified that one time, when she was nine or ten years old, her father touched her breasts when they were in the restroom at the dentist's office that had a carpet on the floor. W.G. admitted she told the prosecutor the previous Friday that her father had touched her "many times," but claimed that statement was not true.

According to W.G., she had been to Kafka's house many times and helped Paz clean Kafka's office building and a dentist office close to Kafka's building. She admitted she told the prosecutor Paz touched her on the bed in the cabana at Kafka's house and it felt "ugly," but claimed it was Elaina's idea for her to say that happened. She also admitted she told Guardiola that when she was ten years old, Paz put his penis inside her vagina at Kafka's office, but again claimed it was Elaina who told her to say it happened. According to W.G., Elaina hated Paz because W.G.'s grandmother gave him a piece of land. W.G. claimed Elaina said she would take W.G. to Oaxaca, Mexico to be with W.G.'s grandmother, with whom W.G. had lived until she was six years old.

---

[3] A.G. did not identify the person she claimed made this statement.

W.G. admitted she told the "lady with the camera"[4] that she was six years old when Paz started touching her and the first time he touched her was at their home. W.G. admitted she told Guardiola that Paz called her into his bedroom, took off her clothes, laid her on the bed, and put his penis inside her vagina. Although she told Guardiola she felt pain when this happened, she claimed at trial the pain "was really just my period." W.G. also admitted she told Guardiola that the last time Paz touched her was at a dentist office. There were two restrooms in the dentist office, one with a tile floor and one with carpet on the floor, and W.G. had been in both bathrooms. W.G. told Guardiola that Paz took her into a bathroom because there were no cameras in that room and turned off the lights. He had her lie on the floor and put his penis inside her vagina.

W.G. admitted she told Guardiola that, after Paz put his penis in her vagina, he would "use his hand to take the white stuff out" and that it looked like foam. She admitted she made an up-and-down motion with her hand to demonstrate to Guardiola what Paz did. However, at trial, W.G. testified she saw semen when a friend showed her a condom "from when she did that with her boyfriend" and did not recall telling the prosecutor she had seen semen somewhere else. W.G. testified that when she was in fourth grade, Paz made her take a "pee test," but did not tell her why he wanted her to "pee" in a glass.

W.G. testified she first told De La Para about the abuse, followed by Elaina, her sister, and Guardiola. She told her foster mother, the nurse at Children's, and her therapist that Paz did not touch her. She told the prosecutor that Paz had not touched her, but admitted she had also told the prosecutor that Paz touched her many times. According to W.G., Paz was a good man, she was afraid he would be "beat up" in prison, and it would hurt the family if he went to prison. She did not realize when she made the allegations that her father could go to prison.

---

[4] Guardiola testified the forensic interview was recorded.

Paz recalled W.G. to testify during his case-in-chief. According to W.G., she lied when she testified that Paz touched her breasts one time. She claimed she believed that if she said Paz touched her breasts, she would be allowed to talk to her father and to the judge. She also testified she told defense counsel the previous day that something different happened in the restroom in the dentist office. W.G. then testified she was never alone with Paz in the restroom at the dentist's office. However, one time, she was taking the trash out at the dentist's office and realized she "had forgotten that [she] needed to take out whatever was in the carpet." She returned to the restroom and saw Paz masturbating. She testified that "was when I saw the white stuff come out."

Elaina denied there was a plan for A.G. and W.G. to fabricate allegations against Paz. She admitted her relationship with Juliana had not always been good. For a time, Elaina was upset because her mother "gave everything" to Juliana, even though Elaina also supported her mother. Elaina and Juliana reconciled when their mother became very ill. At the time of A.G.'s and W.G.'s outcries, Eliana and Juliana had a good relationship, and Elaina had developed a relationship with A.G. and W.G. Elaina had not seen W.G., and had seen A.G. only once, since they had returned to Juliana's house, and she was no longer on speaking terms with Juliana.

Paz was charged with continuous sexual abuse of a young child as to W.G. and indecency with a child as to A.G. At the close of the evidence, the State did not oppose Paz's motion for an instructed verdict of acquittal on the charge of indecency with a child.[5] The jury found Paz guilty of continuous sexual abuse of a young child as to W.G., and the trial court assessed punishment of forty years' imprisonment.

---

[5] Although not specifically stated in the record, it appears the basis for the acquittal of the offense of indecency with a child was the evidence failed to establish A.G. was younger than seventeen years of age at the time of the alleged touching. *See* TEX. PENAL CODE ANN. § 21.11 (West 2011) (requiring child to be younger than seventeen years of age for offense of indecency with a child).

**Sufficiency of the Evidence**

In his first point of error, Paz argues the evidence is insufficient to prove he committed two or more acts of sexual abuse against W.G. We review the sufficiency of the evidence under the standard set out in *Jackson v. Virginia*, 443 U.S. 307 (1979). *Matlock v. State*, 392 S.W.3d 662, 667 (Tex. Crim. App. 2013). We examine all the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson*, 443 U.S. at 319; *Matlock*, 392 S.W.3d at 667. This standard recognizes "the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319; *see also Adames v. State*, 353 S.W.3d 854, 860 (Tex. Crim. App. 2011). As the fact finder, the jury is entitled to judge the credibility of the witnesses, and can choose to believe all, some, or none of the testimony presented by the parties. *Chambers v. State*, 805 S.W.2d 459, 461 (Tex. Crim. App. 1991); *see also Wise v. State*, 364 S.W.3d 900, 903 (Tex. Crim. App. 2012) ("The factfinder exclusively determines the weight and credibility of the evidence.").

We defer to the jury's determinations of credibility, and may not substitute our judgment for that of the jury. *Jackson*, 443 U.S. at 319; *Thornton v. State*, 425 S.W.3d 289, 303 (Tex. Crim. App. 2014); *King v. State*, 29 S.W.3d 556, 562 (Tex. Crim. App. 2000) (in conducting legal sufficiency analysis, appellate court "may not re-weigh the evidence and substitute our judgment for that of the jury"). When there is conflicting evidence, we must presume the factfinder resolved the conflict in favor of the verdict, and defer to that resolution. *Jackson*, 443 U.S. at 326; *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). Circumstantial evidence is as probative as direct evidence and, alone, can be sufficient to establish guilt. *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). Evidence is sufficient if "the

inferences necessary to establish guilt are reasonable based upon the cumulative force of all the evidence when considered in the light most favorable to the verdict." *Wise*, 364 S.W.3d at 903.

Paz argues the evidence is insufficient to support a finding that he committed two or more acts of sexual abuse against W.G. because W.G. recanted the allegations.[6] A person commits the offense of continuous sexual abuse of a young child if, during a period that is thirty or more days in duration, the person commits two or more acts of sexual abuse against a child younger than fourteen years of age. TEX. PENAL CODE ANN. § 21.02(b) (West Supp. 2014). As relevant to this appeal, "sexual abuse" includes aggravated sexual assault. *Id.* § 21.02(c)(4). A person commits aggravated sexual assault if the person intentionally or knowingly causes the penetration of the sexual organ of a child by any means. *Id.* § 22.021(a)(1)(B)(i).

W.G. made multiple outcries that Paz was sexually abusing her. W.G. told De La Para, Elaina, and Maldonado that Paz was touching her. W.G. told Rivas that Paz was doing "worse things" than touching her. W.G. told Edwards that Paz put his penis in her vagina, but never ejaculated inside her. W.G. told Guardiola that Paz put his penis in her vagina at her home, in the cabana at Kafka's house, at Kafka's office, and at a dentist office. She described how the abuse felt and demonstrated how, after he removed his penis from her vagina, Paz would masturbate until he ejaculated. She specifically told Guardiola the abuse happened in the bathroom at the dentist office.

Even though W.G. began recanting her allegations almost immediately after Paz was arrested, she was not consistent in doing so. W.G. made an outcry to the prosecutor following Paz's arrest, leading to the discovery of the carpet in the restroom at Blum's dentist office. Testing on the carpet removed from the restroom established that Paz's sperm was present in the

---

[6] Paz also argues that he was acquitted of the charges relating to A.G. and A.G.'s case "is too similar to [W.G.'s] case to lead to opposite results." As noted above, there were issues relating to A.G.'s age at the time of the alleged touching that are not present in W.G.'s case.

carpet and W.G. could not be excluded as a contributor to one of the epithelial cell fractions of one of the samples from the carpet. W.G. admitted that Paz made her take a "pee test," from which the jury could reasonably infer Paz was attempting to ascertain whether W.G. might be pregnant.

W.G.'s testimony at trial was inconsistent. She first testified Paz touched her breasts one time, but admitted she previously told the prosecutor Paz touched her many times. When recalled by the defense, W.G. stated Paz never touched her breasts and she lied in her previous testimony. W.G. also changed her testimony about how she was familiar with the appearance of semen, first stating a friend showed her a used condom and then testifying that she saw Paz masturbating in the restroom at the dentist's office. W.G. testified she loved Paz, did not want to see him in jail, was afraid he would be "beat up," and that it would hurt the family if he went to prison.

Only a few days after W.G.'s outcry, Eliana told Lopez that she was afraid Juliana was trying to get both A.G. and W.G. to recant. Lopez interviewed Juliana and believed she was more interested in having Paz released from jail than in the allegations her daughters had made. Orona removed W.G. from Juliana's care because she did not believe Juliana would be protective of W.G. Finally, A.G. admitted she contacted Castellan shortly before trial and asked that Castellan and Maldonado refuse to appear at trial, from which the jury could infer W.G.'s family was attempting to prevent evidence of the abuse from being presented at trial.

The jury as the trier of fact was the judge of the credibility of the witnesses and could choose to believe all, some, or none of the testimony presented. *Wise*, 364 S.W.3d at 903; *Chambers*, 805 S.W.2d at 461. The jury, therefore, could believe the evidence that Paz repeatedly sexually abused W.G. from when she was six years old until she made her outcry at the age of twelve and to determine W.G.'s recantations were not credible and resulted from

pressure applied by her family. *See Chambers*, 805 S.W.2d at 461 (concluding complainant's recantation did not destroy probative value of evidence of abuse, stating "[t]he jury observed the complainant's demeanor and was entitled not only to reconcile any such conflicts, but even to disbelieve her recantation"); *Martines v. State*, 371 S.W.3d 232, 242 (Tex. App.—Houston [1st Dist.] 2011, no pet.); *Saldana v. State*, 287 S.W.3d 43, 60 (Tex. App.—Corpus Christi 2008, pet. ref'd) ("A fact finder is fully entitled to disbelieve a witness's recantation."). In convicting Paz of continuous sexual abuse of a young child, the jury resolved the conflicting evidence in this case and made a credibility determination to believe W.G.'s outcries to Elaina, De La Para, Edwards, Guardiola, and the prosecutor, instead of her recantation. We afford almost complete deference to this determination. *Jackson*, 443 U.S. at 319; *Thornton*, 425 S.W.3d at 303.

We conclude the evidence is sufficient for a rational juror to find Paz committed two or more acts of sexual abuse against W.G., a child under the age of fourteen, over a period of thirty days or more. Accordingly, we resolve Paz's first point of error against him.

### Definition of "Reasonable Doubt" in the Jury Charge

In his second point of error, Paz argues the trial court erred by including a definition of reasonable doubt in the jury charge. The trial court instructed the jury that the State had the burden of proof beyond a reasonable doubt as to each element of the offense. The charge then instructed the jury, "It is not required that the prosecution proves guilt beyond all possible doubt; it is required that the prosecution's proof excludes all 'reasonable doubt' concerning the defendant's guilt." Paz contends this instruction impermissibly defines "reasonable doubt." *See Paulson v. State*, 28 S.W.3d 570, 573 (Tex. Crim. App. 2000).

The court of criminal appeals has concluded a trial court does not abuse its discretion by giving the complained-of instruction. *See Mays v. State*, 318 S.W.3d 368, 389 (Tex. Crim. App. 2010); *see also O'Canas v. State*, 140 S.W.3d 695, 702 (Tex. App.—Dallas 2003, pet. ref'd)

–17–

(complained-of instruction "simply states the legally correct proposition that the prosecution's burden is to establish proof beyond a *reasonable* doubt and not *all possible* doubt" and does not define reasonable doubt). Therefore, the instruction given in this case did not define reasonable doubt, and the trial court did not err by including it in the jury charge. *See Mays*, 318 S.W.3d at 389. We resolve Paz's second point of error against him.

**Trial Court's Jurisdiction to Hear the Case and Render Judgment**

In his third point of error, Paz asserts the 291st Judicial District Court, in which the case was adjudicated, lacked jurisdiction to hear the case and render judgment. Paz specifically argues that a grand jury was impaneled by the 204th Judicial District Court, but the indictment was returned to the 291st Judicial District Court, where it remained through the entry of judgment. Paz contends that, because the record does not include a transfer order from the 204th Judicial District Court to the 291st Judicial District Court, the 291st Judicial District Court never acquired jurisdiction over this case.

Texas courts have concluded that the absence of a transfer order from the record is a procedural error rather than a jurisdictional error. *Mills v. State*, 742 S.W.2d 831, 835 (Tex. App.—Dallas 1987, no pet.); *Lemasurier v. State*, 91 S.W.3d 897, 899–900 (Tex. App.—Fort Worth 2002, pet. ref'd). The absence of a transfer order merely subjects the transferee court to a timely plea to the jurisdiction; it does not render actions of the transferee court void. *Mills*, 742 S.W.2d at 835; *Lemasurier*, 91 S.W.3d at 899. If no timely plea to the jurisdiction is filed in the trial court, the defendant waives the right to complain about the lack of a transfer order on appeal. *Mills*, 742 S.W.2d at 835; *Lemasurier*, 91 S.W.3d at 899–900. Because Paz did not file a plea to the jurisdiction in the trial court, he has waived his complaint on appeal about the lack of a transfer order. *See Mills*, 742 S.W.2d at 835; *Lemasurier*, 91 S.W.3d at 900.

However, even if Paz had preserved this issue for our review, it has no merit. A defendant has the right to be tried in a court with jurisdiction over him and the subject-matter of the case. *Saldano v. State*, 70 S.W.3d 873, 888 (Tex. Crim. App. 2002). Jurisdiction over felony cases, such as this case, lies in the district court or criminal district court where the indictment is first filed. TEX. CODE CRIM. PROC. ANN. arts. 4.05, 4.16 (West 2015). In counties having two or more district courts, the judges of the courts may adopt rules governing the filing, numbering, and assignment of cases for trial, and the distribution of the courts' work as they consider necessary or desirable for the conduct of the business of the courts. TEX. GOV'T CODE ANN. § 24.024 (West Supp. 2014); *see also id.* § 74.093(a)–(b) (West 2013) (addressing adoption of local rules of administration to provide, in part, for assignment, docketing, transfer, and hearing of all cases). Thus, while a specific district court may impanel a grand jury, it does not necessarily follow that all cases returned by that grand jury are assigned to that court. *Bourque v. State*, 156 S.W.3d 675, 678 (Tex. App.—Dallas 2005, pet. ref'd).

In this case, a grand jury was impaneled in the 204th Judicial District Court, but the indictment was presented to, and filed in, the 291st Judicial District Court where the case was adjudicated. No transfer order is required where one court empanels the grand jury that returns the indictment in the case, but the indictment is filed in another court. *Id.* Therefore, a transfer order to the 291st Judicial District Court was not required. *Id.* We resolve Paz's third point of error against him.

### Reformation of Judgment

We may modify a trial court's judgment to correct a clerical error when we have the necessary information before us to do so. TEX. R. APP. P. 43.2(b); *Bigley v. State*, 865 S.W.2d 26, 27–28 (Tex. Crim. App. 1993); *Asberry v. State*, 813 S.W.2d 526, 529–30 (Tex. App.—Dallas 1991, pet. ref'd). The reporter's record reflects Paz's attorney at trial was Al Mendez,

–19–

while the judgment reflects Paz's trial counsel was Roberto Alonzo. Accordingly, on our own motion, we modify the judgment to reflect Paz's trial counsel was Al Mendez.

As modified, we affirm the trial court's judgment.


/Robert M. Fillmore/
ROBERT M. FILLMORE
JUSTICE

Do Not Publish
TEX. R. APP. P. 47

141127F.U05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

RUBEN LORENZO PAZ, Appellant

No. 05-14-01127-CR V.

THE STATE OF TEXAS, Appellee

On Appeal from the 291st Judicial District Court, Dallas County, Texas,
Trial Court Cause No. F-1353572-U.
Opinion delivered by Justice Fillmore,
Justices Stoddart and Richter participating.

Based on the Court's opinion of this date, the section of the trial court's judgment titled "Attorney for Defendant" is modified to state "Al Mendez."

As **MODIFIED**, the judgment is **AFFIRMED**.

Judgment entered this 22nd day of October, 2015.